# EXHIBIT F

# MACMILLAN KECK
ATTORNEYS & SOLICITORS

Richard Keck
469 7th Avenue, Suite 419
New York, NY 10018
O: +1 212 359-9599
M: +1 404 348-3333
F: +1 646 349-4989
richard@macmillankeck.pro

*Admitted in England & Wales,
Georgia and New York*

19 May 2011

AAA Mid-Atlantic, Inc.
Travel Syndication Technology, LLC
One River Place
Wilmington, Delaware 19801

Att'n Mr. Bernhard M. Koch

Re: Fuzebox LLC

Dear Mr. Koch,

This firm represents Fuzebox LLC ("FB"). We have been asked to respond to your letter of 16 May 2011 in which Travel Syndication Technology, LLC ("TST") has purported to terminate, effective as of 15 June 2011, the "Existing Contract" among (1) FB as "Consultant" and (2) TST, AAA Mid-Atlantic Inc., Alberta Motor Association Travel Agency, Ltd., CAA Travel (South Central Ontario) Inc. and Ohio Motor Club as "Customer." We have also been asked to address the other actions that Customer has taken in recent weeks and is continuing to take with the intent and effect of unlawfully gutting FB's business by raiding its workforce and misappropriating and/or infringing its intellectual property.

We demand that Customer immediately cease and desist from all unlawful activity directed at or involving FB's workforce and intellectual property. We further strongly recommend that Customer reconsider the legal, financial, practical and public relations consequences of the actions it has already taken and the actions it intends to take. We have been authorized to allow Customer until noon EDT on Friday, 20 May 2011 to confirm that it has ceased and desisted from its unlawful activities and to inform FB whether Customer wishes to withdraw its purported termination of the Existing Contract.

If Customer does not take these actions, then FB will be forced to take whatever steps may be appropriate to protect its rights and interests. The following is a non-exhaustive listing of the legal consequences of Customer's recent and ongoing course of conduct:

First, Customer's actions are a fundamental breach of the Existing Contract, entitling FB to terminate immediately and recover its damages. Section 16 of the PSA does not permit Customer to terminate an outstanding Work Authorization without cause. And, as Customer is well aware, no basis exists to terminate for cause. As a result, Customer's termination constitutes a repudiation of the existing Work Authorization, bringing the contract to an end at the sooner of 15 June 2011 or FB's acceptance of the repudiation, and entitling FB to recover its damages for breach of contract. FB's damages would be measured under applicable law as the amount of money required to put FB in the same position in which it would have been had Customer fully performed its obligations under the existing Work Authorization.

MACMILLAN KECK
19 May 2011
Letter to AAA Mid-Atlantic, Inc.
Travel Syndication Technology, LLC
Re: Fuzebox LLC
Page 2 of 4

In other words, Customer would be liable to FB for the profits FB would have earned through completion of the existing Work Authorization plus any expenses incurred by FB in reliance on the existing Work Authorization that FB is unable to avoid or mitigate following the breach.

Second, Customer's actions are in violation of its covenant in the Existing Contract not to target and hire away FB's workforce. Section 13 of the PSA forbids Customer from targeting FB's employees and sub-contractors for the purpose of hiring such individuals. FB has been informed that Customer has recently rented temporary offices in premises near FB's place of business where the team dedicated to the TST project is located, that Customer is now negotiating a long-term lease in the same location, and that Customer has spoken with one or more FB employees and contractors about the possibility of becoming employed by TST. In addition, FB also learned over the past two days that Customer has communicated to its rank and file personnel who are involved with the project, apparently with no duty of keeping such communications confidential, that Customer intends to terminate the Existing Contract. Customer knowingly and recklessly made these communications with the design or knowledge that they would quickly be repeated to members of FB's development team, undermining the team's morale and causing FB's individual employees and sub-contractors to begin looking for alternative employment. These actions are deliberate and affirmative steps to target and disrupt FB's project team with an intention to hire such individuals to work directly for Customer. As such, they are a direct and flagrant violation of Section 13 of the PSA. As a result of this breach, FB is entitled to obtain injunctive relief to prohibit Customer from soliciting and hiring these individuals and to recover its damages caused by the breach.

Third, apart from Section 13 of the PSA, Customer's actions in targeting FB's workforce are also an intentional tort against FB, for which FB is also entitled to injunctive relief and damages. FB invested its time, skill and money in identifying, hiring, training and supervising the individual employees and sub-contractors comprising its dedicated Customer team and in developing them into an organized and effective project team with expertise and experience in the subject matter of the Work Authorization and Customer's business requirements. As evidence of Customer's premeditated raid on FB's workforce and attempts to lure those individuals to come work for Customer, nothing could be clearer than Customer's rental of premises adjacent to FB's place of business. Again, if Customer proceeds with these plans, then FB will be entitled to injunctive relief and, in any event, Customer will be liable to FB for FB's actual compensatory damages and exemplary damages, both for the harm that has already occurred and for further injury caused if Customer does not cease and desist.

Fourth, FB has learned that (1) Customer has told FB's offshore sub-contractor, Valtech, that Customer is terminating the Existing Contract and (2) Customer is actively soliciting Valtech to resume work on the project covered by the Work Authorization directly for Customer. Though FB is still assessing the facts and conferring with counsel, these actions by Customer appear to constitute tortious interference with FB's contractual and business relations with Valtech. As such, FB is entitled to injunctive relief against further interference by Customer and to recover its damages.

Fifth, Customer is engaged in a deliberate effort to misappropriate FB's trade secrets and know-how, infringe its copyrights and otherwise abscond with FB's intellectual property, for which FB is entitled to injunctive relief and damages. In addition to the investment in its workforce, FB has also invested time, skill, know-how and money in developing, acquiring, integrating and refining the software development tools, work protocols, organizational structure and other business methods within its project team and its project templates and work systems that enable effective, efficient and reliable productivity in executing

MACMILLAN KECK
19 May 2011
Letter to AAA Mid-Atlantic, Inc.
Travel Syndication Technology, LLC
Re: Fuzebox LLC
Page 3 of 4

the scope of work for Customer under the Work Authorization. These items constitute valuable and legally protected FB trade secrets, copyrighted materials, know-how and other intellectual property specifically designed to make the project team efficient and effective in providing services to Customer and in enabling any project team to execute the scope of work under the existing Work Authorization. They are not part of the deliverables or work product to be supplied by FB to Customer, and paid for by Customer, under the PSA, but rather are and remain FB's own intellectual property and, in the case of trade secrets and know-how, FB's Confidential Information protected under Section 8 of the PSA against unauthorized disclosure or use by Customer.

FB has discovered that Customer took steps in late April or early May 2011 to migrate FB's documentation for the project, not only including the completed deliverables and work in progress on later deliverables, but also including FB's own development assets and other project-related intellectual property, from the servers and storage devices under FB's control to servers and storage facilities under Customer's control. In doing so, Customer has directly interfered with FB's relations with its senior management by inducing certain individuals to cooperate with Customer in its efforts in violation of their terms of employment. These actions by Customer are a willful and unlawful misappropriation and infringement of FB's intellectual property rights.

Moreover, Customer's actions in targeting and attempting to take over FB's workforce, every member of which has assigned all intellectual property rights in his or her work product to FB and has contractual duties not to disclose or use FB's intellectual property to or for any other person, will result in an inevitable disclosure of such trade secrets and other intellectual property to Customer, with the clear intention that Customer will appropriate the same for its own use. FB learned yesterday that Customer has invited and induced FB personnel to meet secretly with representatives of Customer outside FB premises and to begin the process of knowledge transfer, including information that comprises FB trade secrets and know-how. FB has also learned that Customer has enlisted such senior personnel to begin interviewing replacements for FB staff whom TST does not intend to recruit, using confidential and proprietary information and trade secrets, and thereby misappropriating and infringing FB's intellectual property. These actions are also tortious interference with FB's contractual relations with its employees and individual sub-contractors.

The past and continuing misappropriation of FB's trade secrets and know-how by Customer entitles FB to injunctive relief, compensatory damages and exemplary damages. The past and continuing infringement of FB's copyrights entitles FB to obtain injunctive relief and recover statutory damages, compensatory damages and legal expenses.

To reiterate, we demand that Customer immediately cease and desist from further interference with and efforts to raid FB's workforce and from further efforts to misappropriate and infringe FB's intellectual property. We further demand that Customer promptly return all original intellectual property of FB currently in its possession. Customer is put on notice that it must not destroy or spoliate any evidence of the activities it has conducted in obtaining or using FB's intellectual property, and that it may not use or disclose FB's intellectual property. As to Customer's purported termination of the Existing Contract, we have been authorized to offer Customer an opportunity to reaffirm its obligations under the existing Work Authorization by withdrawing its purported termination. Customer has until noon on Friday, 20 May 2011 to confirm its has ceased and desisted from all wrongful activities and returned all originals of FB's intellectual property and to inform FB whether it intends to withdraw its purported termination of the

MACMILLAN KECK
19 May 2011
Letter to AAA Mid-Atlantic, Inc.
Travel Syndication Technology, LLC
Re: Fuzebox LLC
Page 4 of 4

Existing Contract. In the meantime, FB has blocked all further access to its servers, and all further communications from Customer with FB must be made through Messrs. Les Ottolenghi, Roxy Mize or Jules Stine or through FB's legal counsel. Unless authorized by one of these three gentlemen or FB's legal counsel, Customer has no authorization from FB to access any of FB's facilities or servers, to have any further discussions with any of FB's employees or sub-contractors or to take, receive, accept or otherwise obtain any further documents, files or information from FB. Please be further advised that all FB employees and sub-contractors involved in the project have contractual duties of non-disclosure, non-competition and non-solicitation of fellow employees or sub-contractors, and any interference by Customer with their performance of such duties will be considered a willful and unlawful attempt to cause such individuals to breach their contractual obligations to FB.

If Customer wants to be released from its contractual obligations to FB, then the proper approach would be to discuss this directly with FB – with a view to agreeing to a fair and reasonable break-up fee that fully compensates FB for its benefit of the bargain under the existing Work Authorization and for the value of its intellectual property and assembled and dedicated project team. We are sure you realize that the previous offers made by TST to FB come nowhere near the mark of fair or reasonable. Customer's taking from FB what does not belong to Customer and otherwise taking actions to destroy FB's business is not a lawful or proper form of negotiation.

We trust Customer will wish to avoid the cost of a legal action in which the ultimate result will be that Customer is liable in contract to fairly compensate FB and pay FB's legal fees and expenses pursuant to Section 22 of the PSA, is liable in tort to compensate FB for its actual damages and to pay exemplary damages for willful misappropriation of trade secrets, and will have to bear its own legal fees and expenses. Resolving Customer's desire to break the contract in an amicable and businesslike manner will also have the added benefit of ensuring FB's cooperation and support for a smooth transition of the project team. On this point, Customer should be aware that Valtech has covenanted with FB not to work directly with Customer under circumstances where FB is being cut out of the loop.

The ball is in your court. You may contact Jules Stine at 404 281-6804 or Roxy Mize at 407 647-4746 for proper negotiations. We in any event expect to hear Customer's response by noon on Friday, 20 May 2011.

Yours sincerely,

Richard Keck

CC: Messrs. Les Ottolenghi and Roxy Mize, Fuzebox LLC
Paul H. Arne, Esq. and Becky Patrick, Esq., Morris, Manning & Martin, LLP