IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRAVEL SYNDICATION TECHNOLOGY, LLC, | |
| Plaintiff/Counterclaim Defendant, | C.A. No. 11-553-RGA-SRF |
| v. | JURY TRIAL DEMANDED |
| FUZEBOX, LLC and DIGITAL COMMERCE, LLC, | |
| Defendants/Counterclaim Plaintiffs, | |
| v. | |
| AAA MID-ATLANTIC INC., | |
| Counterclaim Defendant. | |

FUZEBOX, LLC & DIGITAL COMMERCE, LLC'S
AMENDED COUNTERCLAIMS

Defendants/Counterclaim Plaintiffs Fuzebox, LLC and Digital Commerce, LLC (collectively referred to as "Fuzebox"), by and through their undersigned counsel, assert the following Amended Counterclaims against Plaintiff/Counterclaim Defendant Travel Syndication Technology, LLC ("TST") and Counterclaim Defendant AAA Mid-Atlantic Inc. ("Mid-Atlantic," together with TST, the "Counterclaim Defendants"), and respectfully state as follows:

PARTIES, JURISDICTION AND VENUE

1.     Defendants/Counterclaim Plaintiffs Fuzebox are Georgia limited liability companies with principal places of business located at 659 Auburn Avenue, Atlanta, Georgia 30312.

2.     Upon information and belief, Plaintiff/Counterclaim Defendant TST is a Delaware limited liability company with its principal place of business located at One River

Place, Wilmington, Delaware 19801.  TST's registered agent for service of process in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

3.      Upon information and belief, Counterclaim Defendant Mid-Atlantic is a Delaware corporation with its principal place of business located at One River Place, Wilmington, Delaware 19801.  Mid-Atlantic's registered agent for service of process in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) as the Counterclaim Parties are citizens of different States and the amount in controversy is in excess of the sum or value of $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over TST pursuant to section 22 of the PSA, wherein TST consented to personal jurisdiction in the State of Delaware, and TST is a Delaware limited liability company.

6.      This Court has personal jurisdiction over Mid-Atlantic because it is a Delaware corporation.

7.      Venue is appropriate in this Court, as to Fuzebox and TST, pursuant to section 22 of the PSA, wherein the Parties consented to venue in the courts of the State of Delaware, and pursuant to 28 U.S.C. § 1441(a).

8.      Venue is appropriate in this Court, as to Mid-Atlantic, pursuant to 28 U.S.C. § 1391.

<u>FACTUAL BACKGROUND</u>

9.      On or around August 7, 2006, certain charter member organizations of the American Automobile Association, including Mid-Atlantic, Alberta Motor Association Travel

Agency, Ltd., CAA Travel (South Central Ontario), Inc. and Ohio Auto Club (collectively, the "AAA Charter Entities"), met with Fuzebox regarding a consulting engagement to research the technical feasibility of developing a unique, integrated, Internet-based web application for the AAA Charter Entities' travel agents and customer members ("Syndication Hub Project" or "SHP").

10.     In April of 2007, AAA Charter Entities and Digital Commerce, LLC ("DC") entered into the PSA[1] regarding the SHP.

11.     The PSA did not define the scope of work for which DC was hired to complete. Indeed, the PSA permitted the scope of work to be determined in separate, subsequent Work Authorization Agreements ("WAA").[2]

12.     Although the PSA provides for a termination of DC "for convenience" or "for cause," the PSA expressly states that a termination "for convenience" shall not affect any WAA or Change Order which is "outstanding" or "in progress:"

> This Agreement may be terminated at any time by either Party, with or without cause (including for no cause), upon thirty (30) days' written notice to the other Party; provided that: (1) such termination shall not affect any Work Authorization Agreement or Change Order which is outstanding and has not been fully performed as of the effective date of the termination (and any such Work Authorization Agreement or Change Order shall continue to be governed by the terms and conditions of this Agreement until all Services contemplated therein have been fully performed and payments therefore made), and (ii) the provisions contained in Sections 11 through 25 (inclusive) of this Agreement shall survive termination of this Agreement, regardless of who causes the termination and under what circumstances.

See PSA § 16.

---

[1]  A copy of the PSA is attached as Exhibit A to TST's Amended Complaint.
[2]  Certain of the WAAs are attached as Exhibit D to TST's Amended Complaint.

13.    The PSA provides that if a conflict exists between the terms of the PSA and the terms of the WAAs, the PSA's provisions govern.  See PSA § 1.

14.    The PSA also contains a non-solicitation provision, which states:

> In consideration of this Agreement and for other good and valuable consideration, during the term of this Agreement and for a period of one (1) year from the date of expiration or termination of this Agreement (at any time for any reason), neither Party shall target any of the other Party's employees or sub-contractors (employed or engaged at any time during the term of this Agreement) for the purpose of hiring such individuals or attempt, directly or indirectly, to solicit, entice, persuade or induce any employee or subcontractor of the other Party to terminate his or her employment or engagement by the other party or to become employed or engaged by any other person, firm or corporation, or approach any such employee or sub-contractor for any of the foregoing purposes or authorize and assist in the taking of any such action by any third party.  This section shall not apply (i) to activities taken pursuant to normal hiring practices which are not designed to target such employees, or (ii) in the event an employee applies for employment by [TST].

See PSA § 13.

15.    The PSA further provides, in pertinent part:

> [Fuzebox] agrees that all materials created as a result of this Agreement including all software, programming, interfaces, advertisements, direct mail pieces, designs, plans, reports, specifications, drawings, schematics, prototypes, models, inventions and all other information made during the course of this Agreement and arising from the services provided under any Work Authorization Agreement (hereinafter referred to as "Intellectual Property") shall be and remain the exclusive property of [TST].

See PSA § 7.

16.    In or around April 2007, the parties also entered into WAA 2 under which DC performed analyses and developed interfaces and other features needed to build and launch the web-based desktop application for travel agents (the "Dashboard").  The Dashboard was to serve as a temporary web-based travel application for AAA Charter Entities' travel agents during the

4

period in which the SHP was being designed and created.  Recognizing the significant amount of time and work needed to complete the SHP, the Dashboard was considered a suitable "first step" for the travel agents associated with the AAA Charter Entities until the time the final and fully integrated SHP would be released.

17.   In or around July 2007, the AAA Charter Entities and DC entered into WAA 3a, which required DC to research and define the initial high-level business requirements for the SHP without concern for technical constraints.  Because of the large-scale and scope of the SHP, WAA 3a stated:

> Given the magnitude of the full Syndication Hub Project, it will take further investigation, analysis and time to fully understand the scope and detailed requirements for this Project.  Therefore, [AAA Charter Entities] and [DC] wish to proceed with this Work Authorization Agreement in order to complete a high-level analysis of the requirements involved to perform a more detailed scoping of the project.

See WAA 3a § 1.0.6

18.   At TST's request, from August 2007 through June 2008, Fuzebox reviewed the AAA National travel technology system development efforts, which entailed the comparison of the existing "Travel 2.0" travel technology project to the plans for TST's SHP.  This work far exceeded the agreed-to scope and requirements as referenced in WAA 3b as outlined below, but it served to further define the requirements for TST's SHP.

19.   In or around October 2007, the parties entered into WAA 3b, entitled "Syndication Hub Scoping." WAA 3b extended the scope of efforts for WAA 3a because, at the time of WAA 3a, the Parties recognized that the SHP's detailed scope and functionality could not be determined until more business requirements were captured and clearly understood by both parties to their satisfaction.  The results of WAA 3b were the creation of documents defining the SHP and are as follows:

5

- Software Requirements Specification (SRS) with use cases, functional requirements, workflows;

- High Level Design (HLD) with technical architecture;

- User Interface Specification (UIS) with screen designs;

- Implementation Plan with detailed work breakdown, timeline and resources.

20.     Also in 2007, DC and the AAA Charter Entities agreed to an assignment of the PSA ("Assignment") whereby Fuzebox "accept[ed] assignment of all of [DC's] duties and obligations of performance under the Agreement." The Assignment did not release DC from any of the obligations set forth in the PSA.  See Assignment § 3.[3]

21.     On June 12, 2008, the results of WAA 3a and WAA 3b were presented by several of the AAA Charter Entities' employees to the TST Steering Committee, which is composed of the senior travel executives from each of the AAA Charter Entities.  At this time, TST, including TST manager Joel Ruff, TST Steering Committee Chairman Donald Smitten, and other Steering Committee members and project managers from each of the AAA Charter Entities, committed to the development of the SHP in an unanimous approval of the project.

22.     On June 26, 2008, Fuzebox and the AAA Charter Entities entered into an interim WAA in which Fuzebox was to perform a Supplier Connectivity Analysis.  The parties agreed that this analysis, which occurred between what previously had been planned as phases III and IV, was necessary since Fuzebox had identified "significant risks and unknowns around the critical portion of the Hub development dealing specifically with internal and external supplier connectivity and integration" during WAA 3b.

---

[3] A copy of the Assignment is attached as Exhibit B to TST's Amended Complaint.

23.     In or around August 20, 2008, Fuzebox and the AAA Charter Entities entered into WAA 4, specifically regarding the Syndication Hub Development.  The purpose of WAA 4 was to develop the final SHP. WAA 4 required full and final development of the Agent software framework, supplier interfaces and Customer User Interfaces ("UIs"), also referred to as Agent, Supplier and Customer UI "Tracks." AAA Charter Entities defined the SHP deliverable to be these three "Tracks" with the Customer UI Track to be a user interface supported by the development work of the Agent and Supplier Tracks.  AAA Charter Entities chose the priority and assigned the importance for development of the SHP in "Tracks" because the AAA Charter 19 Entities wanted the Business to Business ("B2B") agent framework for the SHP to be released first.

24.     On or about August 20, 2008, concurrent with and included in the signing of WAA 4, TST informed Fuzebox it would be paid for a long-term Maintenance and Support Agreement (MSA) that would begin in earnest upon the first deliverable of the SHP scheduled for 2009.  Fuzebox priced the SHP according to TST's verbal and written commitment that Fuzebox would perform under the MSA for a period of no less than one (1) year subsequent to the SHP's completion.  TST did in fact pay Fuzebox approximately eighteen percent of the total development costs to date on the SHP as each increment and iteration of the SHP was released from September 2008 through June 15, 2010.  A formal written MSA was authored, reviewed and revised by the parties between September of 2008 and February of 2010 with the expectation that the final MSA would be consummated by January 31, 2011.  Both parties acted upon the verbal agreements and performed under these terms, indicating an understanding and agreement regarding the MSA.

25.     WAA 4 required Fuzebox to develop the SHP pursuant to a "Waterfall" methodology of software development. The Waterfall methodology attempts to fix time, price and scope on a project and sets deliverables according to a sequential design and acceptance process. Typically, the Waterfall methodology requires progression through the phases of requirements, design, implementation, verification and maintenance. Pursuant to section 5.1 of WAA 4, Fuzebox was to be paid $4.5 million, with a ten percent possible cost variance for development of the final SHP, which was to be paid on an incremental basis. TST defined the development of the SHP to be "Incremental." In addition, TST contracted to retain a hold-back of the initial payment to Fuzebox of $250,000 until Fuzebox completed the SHP. Fuzebox was required by TST to have executive oversight within the SHP by Fuzebox senior management and participate in regular TST Steering Committee meetings scheduled by TST.

26.     In or around September of 2008, TST and Fuzebox engaged in a SHP "kick off" meeting in Phoenix, Arizona. At this time, TST had not committed the full set of necessary resources to the SHP, nor did TST have its AAA Entities club level project coordinators or managers in place. TST communicated to Fuzebox that a major business driver of the WAA 4 was to build and deploy a travel agent solution competitive to the Travel 2.0 travel agent product being developed by AAA National and achieve complete independence from AAA National's travel systems, thereby establishing TST for profit travel business models. During the kickoff meeting TST communicated to Fuzebox that another driver of the SHP was TST's intention to obtain its own travel supplier contracts and preferred relationships outside of AAA National and to eliminate its dependence on AAA National.

27.     Later, Fuzebox was engaged by TST to integrate the Campana and Globalware back office systems into the TST SHP. This project was outside the scope of WAA 4.

8

28.     Shortly thereafter, in or around October 2008, Fuzebox and the AAA Charter Entities agreed to a Novation which substituted Travel Syndication Technology, LLC ("TST") for the AAA Charter Entities "in all of the agreements and understandings set forth in the [Agreement] and to completely release the [AAA Charter Entities] from their obligations under those agreements and understandings." See Novation.[4]  From September 2008 through March 2010, Fuzebox was directed to deliver software to support the SHP that followed a project plan that described the SHP in six deliverable increments.

29.     In or around November 2008, and through April 2010, Fuzebox was engaged by TST to perform additional work outside of the scope of WAA 4, including but not limited to, the creation of marketing materials for the TST Dashboard and SHP products, video production for marketing materials and general support of efforts to resell the SHP in the travel retail marketplace.  Fuzebox also produced internal videos for demonstration of product functionality, product progress and daily comprehension of product development efforts as well as market feedback for the product.  Fuzebox executives were also asked by TST to report and participate in TST Board of Manager (BOM) meetings, and to perform this additional work outside of the scope of WAA 4.

30.     In or around January 2009, TST requested that Fuzebox accelerate the design and development plans for a cruise travel supplier connection in order to eliminate dependency on the AAA National choice of technology and further requested that Fuzebox begin development of a separate software application that could be resold to the retail travel industry at large.  TST asked Fuzebox to demonstrate a proof of concept for the purposes of demonstration to cruise travel suppliers who were uncertain of TST's ability to negotiate contracts outside of AAA

---

[4] A copy of the Novation is attached as Exhibit C to TST's Complaint.

National.  Fuzebox was asked by TST to perform this additional work outside of the scope of WAA 4.

31.     In or around June 2009, TST asked Fuzebox to provide periodic updates to the Chief Information Officers ("CIO") of all the AAA Charter Entities as well as to assist in the formation and management of a CIO committee.  These requirements were not contained in any WAAs.

32.     On or about June 15, 2009, Fuzebox and TST reached an agreement that called for Fuzebox to deliver a business analysis and outline of a strategic business plan to help TST define a new sustainable business model for AAA Charter Entities to enter into new revenue models as well as on-line marketing.  The agreement also called for expansion of TST's original business goals including relicensing TST's technology products and defining a service delivery model, including a full organizational and operating structure for the future TST software company.  With this agreement, Fuzebox was engaged in a strategic business relationship not originally contemplated or defined in WAA 4, which extended the relationship of the Parties beyond the delivery of the SHP.  In addition, TST supplemented the program governance to add a strategy team to which the project management office reported and Fuzebox was a participant. Although the effective dates of this agreement were June 15, 2009 through October 31, 2009, and the parties fully performed under this agreement, Work Authorization Agreement Exhibit "H" to the PSA was not signed until September 2, 2009.

33.     At TST's request, from June 20, 2009 through July 15, 2009, Fuzebox participated in an Enterprise Syndication Bus ("ESB") development team in coordination with the AAA Charter Entities' CIO committee to develop a system integration methodology and

platform for integrating SHP into each of the AAA Charter Entities' IT systems and organizations.  This effort was also outside the scope of any WAAs.

34.     In or around October 28, 2009, almost one year after Fuzebox had begun work under WAA 4 and was nearing completion of the initial release of the Agent framework and Agent UI, Bernhard "Berni" Koch, TST's treasurer, met with Fuzebox and requested assistance in creating plans for TST to resell software.  Mr. Koch informed Fuzebox that TST had contemplated Fuzebox's participation in the newly formed software company, which would resell the TST SHP and create other software to be marketed for profit to AAA and non-AAA travel retail companies in the industry at large.  Fuzebox was also asked to pursue validation and testing of the reselling of the TST Dashboard software to AAA and non-AAA entities.  TST requested that Fuzebox develop a full business plan to execute the development of a for-profit software corporation to be operated outside the charter of AAA National.  Mr. Koch later confirmed this interest at a dinner meeting with Fuzebox's consulting CFO and Treasurer.

35.     Subsequently, in or around November 2009, the parties entered into an amendment of WAA 4.  By way of this amendment, the parties modified certain terms such as the scope of work, termination, and payment provisions.

36.     In or around February 2010, approximately eighteen months after Fuzebox began development pursuant to the "Waterfall" methodology of development, TST "reset" the program to an "Iterative" methodology of software development and moved away from the "Incremental" development of the SHP.  The "Iterative" methodology has the primary objective of reducing inherent project risk by breaking a project into smaller segments, like a series of "mini-waterfalls." All phases of each "mini-waterfall" are defined for completion in a sequence that allows several iterations to be worked on simultaneously.  Because the new SHP "Iterative"

approach allowed for several SHP iterations to be worked on concurrently, most work on the major deliverables of the SHP were begun in parallel concurrent with the original scope and project team resourcing being expanded.  The parties continued to perform pursuant to WAA 4 as amended in November 2009, and, accordingly, Fuzebox continued to develop the Agent B2B software framework, worked on several major functions at once and delivered a customer UI based upon the Agent Track by August 15, 2010, per direction by the TST BOM.

37.    In or around March of 2010, TST had formally accepted the first release of the original SHP.

38.    As Fuzebox was progressing towards completion of the Agent B2B search framework in the second release, TST again expressed its intent to "reset" the SHP development program; however, TST requested that Fuzebox present a program plan which would develop a Business to Customer ("B2C") software product to compete with Travelocity and replace AAA.com rather than utilize the Agent Track and framework and simply design a customer UI to work with the Agent Track.

39.    TST also asked Fuzebox to design and develop a customer focused software application in an accelerated timeframe with a significantly larger number of technical resources, increased budget, and newly defined scope and schedule.  TST communicated to Fuzebox that it must by-pass the AAA National B2C initiative with Travelocity and replace present AAA National B2C member technology with the TST product before the summer of 2011.  TST offered that it would pay Fuzebox to develop a separate code base for the project not contemplated in WAA 4.  TST also communicated to Fuzebox that the new scope should include social networking capabilities that would allow TST to become more aggressive online in marketing to an entire internet audience and avoid the limitations imposed by the AAA National

charter.  Such SHP functionality to replace AAA.com and compete with Travelocity had not been defined in WAA 4.

40.     In addition, TST now required that Fuzebox develop the AAA Charter Entities' customer/member B2C deliverable contemporaneously with the agent B2B framework and UI.

41.     On or about May 6, 2010, Don Smitten approached Fuzebox about an expanded role that contemplated a major financial and program reset in order to accomplish a more aggressive timeline and functional goals for the SHP as well as reflect TST's interest in reselling the B2C software solution to other AAA clubs.

42.     To accommodate TST's request, on or about June 2010, Fuzebox directed its subcontractor, Valtech, Inc. ("Valtech," formerly known as Adea prior to its acquisition by Valtech), to establish a new iterative development proposal for the SHP.

43.     During June and July 2010, TST Project Coordinators and Managers were directed by an AAA Charter Entity, Mid-Atlantic, to reset the TST Program schedule, approach and timeline.  The new schedules and approaches were prescribed by  Mid-Atlantic's project management office.  Fuzebox was asked to reset its software development plans and priorities according to the new SHP schedule defined by  Mid-Atlantic and propounded by TST.

44.     From June 20, 2010 through July 15, 2010, Fuzebox presented a review of its vision of the new B2C and B2B SHP work, program governance and program plan going forward with the review and approval of the lead TST program and product managers from the AAA Charter Entities.

45.     In order to complete the SHP development under this new method pursuant to the timelines requested by TST, TST required Fuzebox to increase its staff by 300% and to obtain additional office space, equipment and resources.

46.     On or about July 2010, Fuzebox was informed that AAA Charter Entity, South Central Ontario, officially resigned from the TST SHP.  Upon information and belief, Mid-Atlantic purchased South Central Ontario's interest in TST, becoming the largest owner of TST.

47.     On July 16, 2010, the Parties "reset" the SHP (the "July 2010 Reset").  TST required Fuzebox to immediately increase its staff by 300% and obtain additional office space, equipment and resources in order to complete the SHP.  Under the July 2010 Reset terms, TST contracted with Fuzebox to complete the SHP for $9 million with payments to be made monthly based upon quarterly Statements of Work (SOW) and estimations.  In addition, TST and Fuzebox expressly agreed that the hold back of a work in progress payment would increase to $700,000.

48.     That same day, on July 16, 2010, the July 2010 Reset proposal was accepted by the TST BOM and later reaffirmed in a status report to the TST Steering Committee.

49.     On July 20, 2010, Fuzebox began work under the July 2010 Reset and began accruing "ramp up" costs from tripling Fuzebox's size and budget.  TST executives internally acknowledged the "ramp up" costs to Fuzebox associated with the requirements of the July 2010 Reset.

50.     In that same month, TST finalized its business plan to establish TST as a "for-profit" software company.  Around the same time, TST also hired Computer Aid, Inc. (CAI) as an independent consultant to manage the SHP project for TST.  CAI provided Natalie Rudow to perform program management services for TST.

51.     In or around August 2010, Joel Ruff of TST informed the AAA Steering Committee of the July 2010 Reset, which had been approved by the AAA Charter Entities' BOM on July 16, 2010.

52.     In or around August 2010, as part of its "ramping up," Fuzebox hired Jayant Chaudhary ("Chaudhary") as acting Chief Technology Officer pursuant to an independent contractor agreement.

53.     Also in August 2010, the first quarterly scope of effort and SOW was presented for review and signature to TST's steering committee, strategy team and project managers entitled "1A B2C-RED Release." The SOW contained new terms including, but not limited to, contemplated penalties to Fuzebox for unaccepted work or delays.  The terms of the 1A B2C Red Release were not included in WAA 4.

54.     Pursuant to the terms of the July 2010 Reset and the PSA, Fuzebox then commenced work on all iterations starting in August and through November of 2010 with a concentrated focus on portions known as 1A Green, 1A Yellow, Cruise, and Dynamic Packaging.  TST was advised of and authorized Fuzebox's work and communicated with Fuzebox regarding work on all July 16, 2010 iterations on a regular basis.

55.     On or about November 11, 2010, Fuzebox senior management met with TST's Treasurer, Mr. Koch in Atlanta, Georgia to review the SHP reset's project progress.  At this meeting Mr. Koch reaffirmed TST's full commitment to Fuzebox completing all phases and iterations of the reset of the SHP per the July 16, 2010 TST Board of Managers meeting.

56.     From August to November 2010, Fuzebox and TST performed under the PSA and July 2010 Reset and the first quarter SOW even though TST had not signed the first quarter SOW.

57.     Despite the absence of a signed first quarter SOW, the parties fully performed thereunder.  In or around November 2010, the work under the first quarter SOW was deemed complete by Fuzebox and was submitted to TST for acceptance.

58.     On or around December 1, 2010 Ms. Rudow announced that a new priority of work deliverables and methodology would be pursued going forward including a renaming of the iterations to "releases." By March 2011, the "releases" method of identifying TST functionality had been reviewed and approved by the TST Steering Committee.

59.     In or around December of 2010, TST imposed penalties on Fuzebox pursuant to the first quarter SOW that was negotiated under the PSA and the July 2010 Reset even though TST still had not signed the first quarter SOW.

60.     By March 10, 2011, work performed pursuant to the PSA, July 2010 Reset, and the first quarter SOW was accepted by TST and payment was made to Fuzebox for that work. TST, however, never signed the first quarter SOW, yet TST's project manager, on March 2, 2011, communicated to the entire TST program, project product teams, steering committee, strategy team and BOM, that the 1A Red Release had been fully tested and accepted by all of the AAA Charter Entities.

61.     In November 2010, Mr. Ruff requested that Fuzebox prepare a SOW for the remainder of the SHP that contemplated all remaining iterations and activities. Between mid-November and mid-December of 2010, the parties exchanged a proposed second quarter SOW. TST specifically added activities related to "cruise lines" and "dynamic packaging," "enterprise service bus" ("ESB"), and long-term architectural and system requirements reviews to the proposed second quarter SOW. The July 2010 Reset enumerated "cruise lines" and "dynamic packaging" in the later phases of the project pursuant to the TST Board Reset presentation in July 16, 2010. Mr. Ruff also asked that Fuzebox prepare a proof of concept requested by Mr. Koch to demonstrate that Dynamic Packaging could be developed.

62.     Notwithstanding the fact that the July 16, 2010 Reset required that work commence on most iterations contemporaneously and all iterations by the first quarter of 2011, thereby precluding termination under Section 16 of the PSA, TST unilaterally inserted termination language into the proposed second quarter SOW.  Because termination during work in progress was antithetical to Section 16 of the PSA, Fuzebox revised the termination language proposed by TST to expressly reinforce PSA Section 16, precluding termination during any development work in progress:

> TST may terminate the SOW without cause by providing 30 days written notice of its intention to terminate.  If TST terminates without cause it must 1) pay Fuzebox for all work in progress; and, 2) pay Fuzebox a one-months termination fee; and, 3) pay the Product completion bonus calculated as follows:  the number of iterations completed divided by the total number of iterations multiplied by $700,000.

63.     TST made no objection to the termination provision within the second quarter SOW.

64.     Although Mr. Ruff stated to Fuzebox that he expected approval of the second quarter SOW quickly, final requirements for the second quarter SOW were not delivered on a timely basis.  Before the second quarter SOW could be completed, TST and CAI decided to adopt different software development and delivery approach in the form of agile development and required Fuzebox to adopt the new development approach.

65.     As of November 2010, Fuzebox had worked on, and incurred costs from, nearly all iterations of the SHP.  TST continued to communicate daily with Fuzebox regarding its progress.

66.     In or about February 2011, Mr. Ruff attended a meeting at Fuzebox's offices to discuss the financial terms of the SHP going forward from the July 2010 Reset.  During this meeting, Mr. Ruff reaffirmed the terms of the July 16, 2010 presentation including verification

of the $700,000 work in progress hold back.  Mr. Ruff made it clear that Fuzebox was to finish

the development phase of the project and provide MSA services for TST under the July 2010

Reset.

67.     On or about March 15, 2011, unbeknownst to Fuzebox, Mid-Atlantic entered into

an agreement with consilium1 (the "Mid-Atlantic-consilium1 Agreement," a true and correct

copy of which is attached hereto as Exhibit A).  The Mid-Atlantic-consilium1 Agreement was

signed by Diane H. Remy,[5] SVP Products & Services for Mid-Atlantic.  The Agreement

provides, inter alia:

> **WHEREAS**, [Mid-Atlantic] is desirous of contracting for services
> described in the job description in attached Schedule A, in support
> of the development of software applications and related processes
> and documents for *Travel Syndication Technology, LLC ("TST")*,
> under the terms and conditions set forth in this Agreement.

Id. p. 1 (emphasis added) .

68.     The Agreement also stated that the consilium1 contractor would work from

Fuzebox's satellite office, notwithstanding Fuzebox's lack of notice or knowledge of the same:

> It is anticipated that the services provided under this Agreement
> will be performed in Atlanta, GA at either the officer of Fuzebox,
> Inc. [sic], or from the home of the individuals supplied by
> consilium1.  For this reason, it is understood that the individual
> placed by consilium1 will be a resident of the Atlanta metropolitan
> area, so that any travel within that area will be considered
> unreimbursed commuting costs and not business travel.  If the
> services are performed at [Mid-Atlantic's] offices, [Mid-Atlantic]
> shall provide office space and facilities to consilium1 personnel to
> the extent necessary to perform the services specified by this
> Agreement.

Id. at ¶ 7.

---

[5] Upon information and belief, Ms. Remy is also a member of TST's Steering Committee.

69.     consilium1 provided Douglas Goldblatt to perform the services Mid-Atlantic requested.  See id.  Neither TST nor Mid-Atlantic informed Fuzebox that Mr. Goldblatt had been retained through consilium1 to work on the SHP.  Upon information and belief, Mr. Goldblatt worked on the SHP before and after TST terminated Fuzebox's contract.

70.     Mr. Goldblatt's interview and hiring process was coordinated by and through TST's program manager, Ms. Rudow, as well as Fuzebox's then-CTO, Chaudhary[6].  (See Emails, attached hereto as Exhibit B).

71.     On or about March 18, 2011, Mr. Koch and Fuzebox met at the Charlotte, North Carolina airport to discuss the proposed terms of the new commercial arrangements pursuant to the July 2010 Reset.  During the meeting, Mr. Koch represented that Fuzebox would be the development services provider under the July 2010 Reset until the development phase of the reset SHP ended.  Mr. Koch further reassured Fuzebox that all development for the SHP would remain in Atlanta, Georgia through the end of the development phases.

72.     On March 24, 2011, Ms. Rudow reported to the TST Steering Committee that the first release for the AAA.com replacement for customers focused on air, car and hotel would be released soon for internal testing and development of all major functions such as Cruise development, improvement to and the extension of B2C air, car and hotel to travel agents, package development, Dynamic Packaging and inventory management and groups would be part of a release schedule of seven software releases to be completed by the end of February 2012. Ms. Rudow also stated that the work efforts for deliverables in the seven releases would commence, including several features of the July 2010 Reset SHP including, air, car, hotel, cruise, and administration.

---

[6] Fuzebox's managing members were unaware of Chaudhary's involvement in recruiting Mr. Goldblatt.  Chaudhary's participation in the hiring process was not authorized by Fuzebox.

73.     In or around mid-March 2011, TST demanded that Fuzebox execute a new time and materials contract in an attempt to escape all commercial terms of the July 2010 Reset and the PSA.

74.     Fuzebox met with TST in late March and early April of 2011 regarding the demand to execute a time and materials contract and replace and cancel the July 2010 Reset and the PSA.   During good faith negotiations for new commercial terms, Mr. Koch expressly reassured to Fuzebox that it had a "no cut" contract until the end of the new SHP development.

75.     In or around April 10, 2011, Mr. Ruff corresponded with Fuzebox indicating TST's intent to have Fuzebox complete the work under the July 2010 Reset.  On April 11, 2011, Ms. Rudow, Chaudhary, Mr. Koch, and Fuzebox met at the Georgia International Congress Center to discuss how the continued business relationship between Fuzebox and TST would proceed until the end of the SHP.

76.     Unbeknownst to Fuzebox, on or around April 20, 2011, TST and consilium1 entered into an agreement whereby consilium1 agreed to provide an individual for the development of the SHP for TST.  (the "TST-consilium1 Agreement," attached hereto as Exhibit C.)  This agreement, which was signed by Mr. Koch, also provided that the contractor would work at Fuzebox's offices or from his residence.  See id. at ¶ 7.

77.     Through consilium1, Matt Ford was brought on to work on the SHP both before and after TST terminated Fuzebox's contract.  See id.  TST never informed Fuzebox that Mr. Ford had been retained through consilium1 to work on the SHP.

78.     At the same time, in or around April 2011, Chaudhary informed Valtech that he had information that TST was going to terminate its contractual relationship with Fuzebox and that he was going to become TST's new CTO.  Chaudhary then requested that Valtech create a

new agile-based development proposal directly for TST.  The proposal by Valtech made no mention of Fuzebox.  Indeed, the managing members of Fuzebox were unaware of the secret communications among Valtech, Chaudhary and TST.

79.     In early May 2011, TST informed Fuzebox that if it did not agree to a time and materials agreement by May 9, 2011, the entire reset SHP was going to come to a halt on May 31, 2011.

80.     On or around May 3, 2011, the managing members of Fuzebox learned of Valtech's proposal to TST by way of an inadvertent email communication from Valtech.

81.     On or around May 5, 2011, TST rejected the time and materials rates proposed by Fuzebox and instead asked for a proposed "buy-out" agreement.

82.     The Parties negotiated proposed "buy-out" terms from May 11, 2011 through May 16, 2011.  On May 16, 2011, Fuzebox rejected TST's buy-out terms and consequently TST purported to terminate Fuzebox "without cause" pursuant to section 16 of the PSA.  By May 16, 2011, Fuzebox had performed work on all iterations of the reset SHP and prior SHP.

83.     On or around May 17, 2011, Fuzebox discovered that Chaudhary and Ms. Rudow, were recruiting employees from Fuzebox to TST, as well as assisting in the recruitment of contractors to replace Fuzebox.

84.     On or around May 19, 2011, after discovering unauthorized communications and transfer of information from Chaudhary to TST, Fuzebox suspended Chaudhary from employment.  On June 2, 2011, Fuzebox asked Mr. Koch if Chaudhary was working for TST, which Mr. Koch denied in writing.  Chaudhary resigned from Fuzebox on June 3, 2011.

85.     On June 6, 2011, Fuzebox discovered that Chaudhary was in fact working for TST prior to June 3, 2011.

86.     On or around May 19, 2011, Valtech's CTO, Guy Duncan, and its CFO, Rick Dupont, informed Fuzebox that they were approached by Mr. Ruff and Ms. Rudow, who represented that Fuzebox was purportedly terminated under the PSA and July 2010 Reset, and that TST would re-approach Valtech within a few weeks to enter into a separate contract to continue the work on the SHP that Valtech had been hired to perform originally by Fuzebox.

87.     New negotiations for the "buy-out" arrangement commenced on May 23, 2011. A "Memorandum of Understanding" for the "buy-out" was signed by the parties.  Pursuant to the "buy-out" terms, TST expressly requested permission to hire Chaudhary as CTO and a release of Fuzebox's employees and contractors to TST or its designee.   (See Memorandum of Understanding ("MOU"), attached hereto as Exhibit D.)

88.     On May 27, 2011, TST rejected Fuzebox's "buy-out" proposal and, that same day, filed the present action in Delaware's Court of Chancery.  This reversed TST's position as stated in the Memorandum of Understanding, without reason or explanation.

89.     In June of 2011, TST visited Fuzebox's Alpharetta, Georgia office and held meetings with groups of Fuzebox employees and contractors.  TST instructed Fuzebox's employees and contractors to check TST's profile on www.linkedin.com for future job postings related to the SHP.  TST hired over fifty (50) Fuzebox employees, contractors and subcontractors subsequent to Fuzebox's termination, including Chaudhary.

90.     TST also hired Valtech to continue work on the SHP subsequent to termination of Fuzebox's services.

91.     By pirating Fuzebox's employees, contractors and subcontractors, TST misappropriated Fuzebox's intellectual property consisting of its development know-how, techniques & well defined operations, processes, tools; carefully selected and trained employees,

22

contractors, offshore development subcontractors and industry experts ("Industrial Property").[7] Fuzebox's Industrial Property represents the collective decades of experience and skills of Fuzebox members in the travel technology domain.

92.     Fuzebox could have completed its obligations under the PSA and the July 2010 Reset within one year.

COUNTERCLAIM I
BREACH OF THE JULY 2010 RESET AGREEMENT

93.     Fuzebox hereby adopts and incorporates by reference the allegations set forth in Paragraphs 1 through 92 of its Counterclaim as if fully set forth herein.

94.     The July 2010 Reset Agreement is a valid and enforceable contract between Fuzebox and TST.

95.     Pursuant to the terms of the July 2010 Reset, Fuzebox and TST agreed that all work for the final SHP was to proceed contemporaneously to completion.  Under this agreement, Fuzebox and TST agreed that Fuzebox was to deliver estimates of costs on a quarterly basis based upon SOWs for various iterations.  TST was to pay for the various iterations on a monthly basis.  Fuzebox was released by TST to work on all iterations of the SHP.

96.     TST failed to perform pursuant to the terms of the July 2010 Reset and purported to terminate the July 2010 Reset on May 16, 2011 without cause and breached the termination clause.

97.     TST failed to pay Fuzebox the hold-back work in progress payment contemplated by, and in violation of, the July 2010 Reset.

---

7  The term "Industrial Property" is used only to distinguish Fuzebox's intellectual property claims from TST's Intellectual Property as defined by the PSA.

98.     Fuzebox had performed all material obligations required of it under the July 2010 Reset.

99.     As a direct and proximate result of TST's breach of July 2010 Reset.  Fuzebox has suffered damages in excess of $4.5 million.

COUNTERCLAIM II
BREACH OF THE PSA

100.    Fuzebox hereby adopts and incorporates by reference the allegations set forth in Paragraphs 1 through 99 of its Counterclaim as if fully set forth herein.

101.     The PSA is a valid and enforceable agreement between Fuzebox and TST.

102.    The PSA's termination clause provides, in pertinent part:

> This Agreement may be terminated at any time by either Party, with our without cause (including for no cause), upon thirty (30) days' written notice to the other Party; provided that:  (i) such termination shall not affect any Work Authorization Agreement or Change Order which is outstanding and has not been fully performed as of the effective date of the termination (and any such Work Authorization Agreement or Change Order shall continue to be governed by the terms and conditions of this Agreement until all Services contemplated therein have been fully performed and payments therefore made), and (ii) the provisions contained in Section 11 through 25 (inclusive) of this Agreement shall survive termination of this Agreement, regardless of who causes the termination and under what circumstances.

103.    TST purported to terminate the PSA on May 16, 2011 without cause and breached subsections (i) and (ii) of the termination clause.

104.    TST terminated the PSA and cancelled Fuzebox's work in progress on the July 2010 Reset before such work could be fully performed.

105.    Fuzebox performed all material obligations required of it under the PSA and the July 2010 Reset.

24

106.    As a direct and proximate result of TST's breach of section 16 of the PSA, Fuzebox has suffered damages in excess of $4.5 million.

COUNTERCLAIM III
PROMISSORY ESTOPPEL

107.    Fuzebox hereby adopts and incorporates by reference the allegations set forth in Paragraphs 1 through 106 of its Counterclaim as if fully set forth herein.

108.    On or about July 16, 2010, TST instructed Fuzebox to proceed with the tasks set forth in the July 2010 Reset.

109.    TST's instruction was intended to, and resulted in the inducement of Fuzebox to begin work under the July 2010 Reset.

110.    In order to complete the SHP development under the July 2010 Reset pursuant to the timelines requested by TST, TST required Fuzebox to increase its staff by 300% and obtain additional office space, equipment and resources.

111.    Fuzebox reasonably relied on TST's instruction and began work under the July 2010 Reset to its detriment.  Fuzebox incurred costs associated with this phase of the SHP, for which TST has failed to provide the agreed upon compensation.

112.    On or about March 18, 2011, Mr. Koch, as designated agent for TST, promised that Fuzebox would be the development services provider under the July 2010 Reset until the development phase was to end.  Mr. Koch further reassured Fuzebox that all development for the SHP would remain in Atlanta, Georgia through the end of the development phases.

113.    Additionally, in late March and early April of 2011 Mr. Koch expressly reassured Fuzebox that it had a "no cut" contract until the end of development.

114.    Fuzebox reasonably relied on these promises and continued to perform under the July 2010 Reset to its detriment.

25

115. TST should be held to its promises as injustice can be avoided only by enforcement of the promise.

116. As a direct and proximate result of TST's injustice, Fuzebox has been damaged in excess of $4.5 million.

COUNTERCLAIM IV
BREACH OF CONTRACT: BREACH OF THE PSA'S
COVENANT NOT TO SOLICIT EMPLOYEES

117. Fuzebox hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 through 116 of its Counterclaim as if fully set forth herein.

118. Pursuant to the assignment and novation of the PSA, Fuzebox and TST entered into a valid and enforceable contract.

119. Pursuant to a non-solicitation provision found in section 13 of the PSA, TST is prohibited from:

> [T]arget[ing] any of the other Party's employees or sub-contractors (employed or engaged at any time during the term of this Agreement) for the purpose of hiring such individuals or attempt, directly or indirectly, to solicit, entice, persuade or induce any employee or sub-contractor of the other Party to terminate his or her employment or engagement by the other party or to become employed or engaged by any other person, firm, or corporation, or approach any such employee or sub-contractor for any of the foregoing purposes or authorize and assist in the taking of any such action by any third party.

See PSA § 13 (emphasis added).

120. TST materially and completely breached the covenant not to solicit employees by, directly or indirectly, soliciting, enticing, persuading or inducing Fuzebox employees, during the one-year restrictive period, with whom Fuzebox had business contact during the time of the PSA and during the one-year restrictive period.

26

121.   TST bargained for and received consideration for the restrictive covenants in the PSA.  As a result of TST's material and complete breach of the PSA, Fuzebox has not received the benefit of its bargain.

122.   TST has failed and refused to perform its obligations under the PSA, including its obligation to not solicit Fuzebox employees.

123.   TST's material and complete breach of the PSA constitutes a failure of consideration.

124.   As a result of TST's breach of the PSA, Fuzebox has suffered (and continues to suffer) damages in an amount to be determined at trial.

125.   TST's breach of the PSA was motivated by ill will and malice, thereby entitling Fuzebox to punitive damages.

COUNTERCLAIM V
BREACH OF CONTRACT:  BREACH OF THE PSA'S
COVENANT NOT TO SOLICIT SUBCONTRACTORS

126.   Fuzebox hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 through 125 of its Counterclaim as if fully set forth herein.

127.   Pursuant to the assignment and novation of the PSA, Fuzebox and TST entered into a valid and enforceable contract.

128.   Pursuant to the covenant not to solicit subcontractors found in section 13 of the PSA, TST is prohibited from:

> [T]arget[ing] any of the other Party's employees or sub-contractors (employed or engaged at any time during the term of this Agreement) for the purpose of hiring such individuals or attempt, directly or indirectly, to solicit, entice, persuade or induce any employee or sub-contractor of the other Party to terminate his or her employment or engagement by the other party or to become employed or engaged by any other person, firm, or corporation, or approach any such employee or sub-contractor for any of the

27

foregoing purposes or authorize and assist in the taking of any such
action by any third party.

See PSA § 13 (emphasis added).

129.    TST materially and completely breached the covenant not to solicit subcontractors

by, directly or indirectly, soliciting, enticing, persuading or inducing a Fuzebox subcontractor,

during the one-year restrictive period, with whom Fuzebox had business contact during the time

of the PSA and during the one-year restrictive period.

130.    TST bargained for and received consideration for the restrictive covenants in the

PSA.  As a result of TST's material and complete breach of the PSA, Fuzebox has not received

the benefit of its bargain.

131.    TST has failed and refused to perform its obligations under the PSA, including its

obligation to not solicit Fuzebox subcontractors.

132.    TST's material and complete breach of the PSA constitutes a failure of

consideration.

133.    As a result of TST's breach of the PSA, Fuzebox has suffered (and continues to

suffer) damages in an amount to be determined at trial.

134.    TST's breach of the PSA was motivated by ill will and malice, thereby entitling

Fuzebox to punitive damages.

COUNTERCLAIM VI
TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

135.    Fuzebox hereby adopts and incorporates by reference the allegations set forth in

paragraphs 1 through 134 of its Counterclaim as if fully set forth herein.

136.    Fuzebox maintains business relations with its employees.

137.    TST and Mid-Atlantic have, at all times, been aware of Fuzebox's business

relations with its employees.  Despite having such knowledge, TST and Mid-Atlantic have

28

tortiously interfered with Fuzebox's business relations with the intent to destroy Fuzebox's business by pirating Fuzebox's entire technology team.

138.    Such acts have been done with malice and bad faith, without privilege, and with the intent to destroy Fuzebox's business.

139.    Fuzebox has been damaged as a direct and proximate result of TST's and Mid-Atlantic's tortious conduct.

140.    TST's and Mid-Atlantic's actions were willful and malicious, thus entitling Fuzebox to an award of punitive or exemplary damages.

141.    As a result of TST's and Mid-Atlantic tortious actions, Fuzebox has suffered (and continues to suffer) damages in excess of $75,000.

142.    TST and Mid-Atlantic are jointly and severally liable for Fuzebox for tortious interference with Fuzebox's business relations.

COUNTERCLAIM VII
TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

143.    Fuzebox hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 through 142 of its Counterclaim as if fully set forth herein.

144.    Fuzebox entered into employment contracts with its employees.

145.    TST and Mid-Atlantic have, at all times, been aware of Fuzebox's contracts with its employees.  Despite having such knowledge, TST and Mid-Atlantic tortiously interfered with Fuzebox's employee relations with the intent to destroy Fuzebox's business by pirating Fuzebox's entire technology team.

146.    Such acts have been done with malice and bad faith, without privilege, and with the intent to destroy Fuzebox's business.

29

147.   Fuzebox has been damaged as a direct and proximate result of TST's and Mid-Atlantic's tortious conduct.

148.   TST's and Mid-Atlantic's actions were willful and malicious, thus entitling Fuzebox to an award of punitive or exemplary damages.

149.   As a result of TST's and Mid-Atlantic's tortious actions, Fuzebox has suffered (and continues to suffer) damages in excess of $75,000.

150.   TST and Mid-Atlantic are jointly and severally liable for tortious interference with Fuzebox's contractual relations.

COUNTERCLAIM VIII
TORTIOUS INTERFERENCE WITH BUSINESS
RELATIONSHIP WITH VALTECH

151.   Fuzebox hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 through 150 of its Counterclaim as if fully set forth herein.

152.   Fuzebox maintained business relations with Valtech.

153.   TST and Mid-Atlantic have, at all times, been aware of Fuzebox's relations with Valtech.  Despite having such knowledge, TST and Mid-Atlantic have tortiously interfered with Fuzebox's relations with Valtech with the intent to destroy Fuzebox's business by pirating Fuzebox's entire technology team.

154.   Such acts have been done with malice and bad faith, without privilege, and with the intent to destroy Fuzebox's business.

155.   Fuzebox has been damaged as a direct and proximate result of TST and Mid-Atlantic's tortious conduct.

156.   TST's and Mid-Atlantic's actions were willful and malicious, thus entitling Fuzebox to an award of punitive or exemplary damages.

157.    As a result of TST's tortious actions, Fuzebox has suffered (and continues to suffer) damages in excess of $75,000.

158.    TST and Mid-Atlantic are jointly and severally liable for tortious interference with Fuzebox's business relations with Valtech.

<u>COUNTERCLAIM IX</u>
TORTIOUS INTERFERENCE WITH CONTRACTUAL
RELATIONS WITH VALTECH

159.    Fuzebox hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 through 158 of its Counterclaim as if fully set forth herein.

160.    Fuzebox entered into a contract with a subcontractor, Valtech.

161.    TST and Mid-Atlantic have, at all times, been aware of Fuzebox's contract with Valtech.  Despite having such knowledge, TST and Mid-Atlantic have tortiously interfered with Fuzebox's contractual relations with Valtech with the intent to destroy Fuzebox's business by pirating Fuzebox's subcontractor.

162.    Such acts have been done with malice and bad faith, without privilege, and with the intent to destroy Fuzebox's business.

163.    Fuzebox has been damaged as a direct and proximate result of TST's and Mid-Atlantic's tortious conduct.

164.    TST's and Mid-Atlantic's actions were willful and malicious, thus entitling Fuzebox to an award of punitive or exemplary damages.

165.    As a result of TST's tortious actions, Fuzebox has suffered (and continues to suffer) damages in excess of $75,000.

166.    TST and Mid-Atlantic are jointly and severally liable for tortious interference with Fuzebox's contractual relations with Valtech.

## COUNTERCLAIM X
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

167.    Fuzebox hereby adopts and incorporate by reference the allegations set forth in Paragraphs 1 through 166 of its Counterclaim as if fully set forth herein.

168.    There is an implied covenant of good faith and fair dealing in the PSA and the July 2010 Reset whereby TST agreed that it would perform its obligations in good faith and in the exercise of fair dealing.

169.    TST's breach of the July 2010 Reset was willful, malicious and intended to cause injury to Fuzebox.

170.    TST's breach of the PSA was willful, malicious and intended to cause injury to Fuzebox.

171.    TST has breached the implied covenant of good faith and fair dealing by acting to evade the letter and spirit of the agreements between the Parties.

172.    Fuzebox has performed all its duties, obligations, conditions and covenants under the agreements, except for those promises, performances, duties and obligations which have been excused by TST's breaches.

173.    As a direct and proximate result of TST's breach of the covenant of good faith and fair dealing, Fuzebox has suffered damages in excess of $4.5 million.

174.    TST engaged in a deliberate scheme to deprive Fuzebox of the benefit of its bargain, thereby entitling Fuzebox to punitive damages.

## COUNTERCLAIM XI
## ATTORNEYS' FEES AND COSTS PURSUANT TO SECTION 22 OF THE PSA

175.    Fuzebox hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 through 174 of its Counterclaim as if fully set forth herein.

176.     Pursuant to the PSA § 22, Fuzebox is entitled to recover all costs and reasonable attorneys' and paralegals' fees incurred in this action.

## COUNTERCLAIM XII
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS WITH TST

177.     Fuzebox hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 through 176 of its Counterclaim as if fully set forth herein.

178.     Fuzebox maintained business relations with TST.

179.     Mid-Atlantic has, at all times, been aware of Fuzebox's business relations with TST.  Despite having such knowledge, Mid-Atlantic tortiously interfered with Fuzebox's business relationship with TST by inducing TST to terminate its business relationship with Fuzebox.

180.     Such acts have been done with malice and bad faith, without privilege, and with the intent to destroy Fuzebox's business.

181.     Fuzebox has been damaged as a direct and proximate result of Mid-Atlantic's tortious conduct.

182.     Mid-Atlantic's actions were willful and malicious, thus entitling Fuzebox to an award of punitive or exemplary damages.

183.     As a result of Mid-Atlantic's tortious actions, Fuzebox has suffered (and continues to suffer) damages in excess of $75,000.

## COUNTERCLAIM XIII
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS WITH TST

184.     Fuzebox hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 through 183 of its Counterclaim as if fully set forth herein.

185.     Fuzebox entered into a valid and enforceable contract with TST.

186.    Mid-Atlantic has, at all times, been aware of Fuzebox's contract with TST. Despite having such knowledge, Mid-Atlantic has tortiously interfered with Fuzebox's contract with TST by inducing TST to terminate its contract with Fuzebox and move the development of the SHP to TST.

187.    Such acts have been done with malice and bad faith, without privilege, and with the intent to destroy Fuzebox's business.

188.    Fuzebox has been damaged as a direct and proximate result of Mid-Atlantic's tortious conduct.

189.    Mid-Atlantic's actions were willful and malicious, thus entitling Fuzebox to an award of punitive or exemplary damages.

190.    As a result of Mid-Atlantic's tortious actions, Fuzebox has suffered (and continues to suffer) damages in excess of $75,000.

<u>COUNTERCLAIM XIV</u>
MISAPPROPRIATION OF FUZEBOX'S INDUSTRIAL PROPERTY

191.    Fuzebox hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 through 190 of its Counterclaim as if fully set forth herein.

192.    Fuzebox has invested time, skill, know-how and money in developing, acquiring, integrating and refining the software development tools, work protocols, organization structure and other business methods; and carefully selected and trained employees, contractors and offshore development subcontractors and industry experts (collectively Fuzebox's "Industrial Property"). These processes and work systems, which are not generally known or available to the public, enable effective, efficient and reliable productivity in executing software development projects, including the SHP. Fuzebox took reasonable efforts to protect its Industrial Property from disclosure. Fuzebox's Industrial Property is not part of the deliverables

to be supplied to TST under the PSA but rather are, and remain, Fuzebox's own Industrial Property.

193.    TST and Mid-Atlantic misappropriated Fuzebox's Industrial Property when they pirated Fuzebox's software development team, including its former CTO, Chaudhary, who was trusted with Fuzebox's Industrial Property.  TST is deriving substantial economic value from using Fuzebox's Industrial Property.

194.    TST has refused Fuzebox's demand for return of the Industrial Property.

195.    Fuzebox's Industrial Property constitutes trade secrets protected under the Georgia Trade Secrets Act of 1990, O.C.G.A. 10-1-760 et seq.

196.     As a result of TST's actions, Fuzebox has suffered (and continues to suffer) damages in excess of $75,000.

## COUNTERCLAIM XV
## CIVIL CONSPIRACY

197.    Fuzebox hereby adopts and incorporates by reference the allegations set forth in paragraphs 1 through 196 of its Counterclaim as if fully set forth herein.

198.    TST and Mid-Atlantic devised and implemented a plan to bring the development of the SHP in-house to TST.

199.    In furtherance of the illicit plan, Mid-Atlantic, among other acts, entered into a contract with consilium1 to develop an IT team for TST and pirated Fuzebox's technology team.

200.    In furtherance of the illicit plan, TST, among other acts, entered into a contract with consilium1 to develop an IT team, wrongfully terminated Fuzebox from the PSA and pirated Fuzebox's technology team.

201.    As a result of TST and Mid-Atlantic's actions, Fuzebox has suffered (and continues to suffer) damages in excess of $75,000.

<u>PRAYER FOR RELIEF</u>

Counterclaim Plaintiffs hereby demand a trial by jury.

WHEREFORE, Counterclaim Plaintiffs respectfully request that this Court grant the following relief against Counterclaim Defendants:

(A)     Award compensatory damages in Counterclaim Plaintiffs' favor and against the Counterclaim Defendants, in an amount proven at trial;

(B)     Award punitive damages in Counterclaim Plaintiffs' favor and against the Counterclaim Defendants, in an amount to be proven at trial;

(C)     Award Counterclaim Plaintiffs all costs and reasonable attorneys' and paralegals' fees incurred in this action; and

(D)     Grant Counterclaim Plaintiffs any such other and further relief as the Court deems just and appropriate.

GREENBERG TRAURIG LLP

 _/s/ Eve H. Ormerod_____
Michael J. Maimone (#3592)
Joseph B. Cicero (#4388)
Eve H. Ormerod (#5369)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
(302) 661-7000
*maimonem@gtlaw.com*
*ciceroj@gtlaw.com*
*ormerode@gtlaw.com*

*Counsel for Defendants/Counterclaim Plaintiffs*
*Fuzebox, LLC and Digital Commerce, LLC*

36

OF COUNSEL:

Richard J. Valladores, Esq.
Thomas J. Mazziotti, Esq.
Yoon J. Ettinger, Esq.
Greenberg Traurig, LLP
3290 Northside Parkway, Suite 400
Atlanta, GA 30327

David Concannon, Esq.
200 Eagle Road, Suite 116
Wayne, PA 19087

Dated:  May 25, 2012

*SFO 596,084,608v4 5-25-12*